## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF OMNI NATIONAL BANK** | |
| **Plaintiff,** | **CIVIL ACTION NO.** |
| **v.** | **JURY TRIAL DEMANDED** |
| **STEPHEN M. KLEIN, IRWN W. BERMAN, BENJAMIN J. COHEN, JULES N. GREENBLATT, KARIM W. LAWRENCE, EUGENE F. LAWSON, III, JEFFREY L. LEVINE, SHANNON C. LIVENGOOD, GREGORY W. PATTEN, AND CONSTANCE E. PERRINE** | |
| **Defendants** | |

## COMPLAINT

Plaintiff Federal Deposit Insurance Corporation ("FDIC-R"), as Receiver of Omni National Bank, states its Complaint against the Defendants, and each of them, as follows:

## INTRODUCTION

1.     On March 27, 2009, the Office of the Controller of the Currency ("OCC") closed Omni National Bank of Atlanta, Georgia ("Omni" or "the Bank")

and appointed FDIC-R as Receiver.  The loss to the Deposit Insurance Fund is currently estimated at $330.6 million.  Pursuant to 12 U.S.C. § 1821(d)(2), FDIC-R is the successor to all claims originally held by Omni, and any stockholder, member, account holder, depositor, officer, or director of such institution with respect to the institution and assets of the institution.

2.     FDIC-R brings this action in its capacity as Receiver for Omni to recover over $24.5 million in losses the Bank suffered on over two hundred Community Development Lending Division ("CDLD") loans on low-income residential properties (collectively, the "Loss Loans") and $12.6 million in wasteful expenditures on low income Other Real Estate Owned ("OREO") properties.

3.     FDIC-R asserts claims against seven former CDLD officers, to wit, Defendants Benjamin J. Cohen ("Cohen"), Jules N. Greenblatt ("Greenblatt"), Karim W. Lawrence ("Lawrence"), Eugene F. Lawson, III ("Lawson"), Jeffrey L. Levine ("Levine"), Shannon C. Livengood ("Livengood"), and Gregory W. Patten ("Patten") (collectively Cohen, Greenblatt, Lawrence, Lawson, Levine, Livengood, and Patten are referred to as the "CDLD Defendants") for negligence and gross negligence in approving the Loss Loans.

4.     The CDLD Defendants approved the Loss Loans despite numerous, repeated and obvious violations of the Bank's loan policies and procedures,

banking regulations and prudent and sound lending practices.  These violations included, but were not limited to: (1) violations of Loan to One Borrower ("LTOB") limits through use of straw borrowers; (2) violations of Loan to Value ("LTV") ratio limits; (3) failure to obtain appraisals prior to funding and/or acceptance of stale appraisals, re-dated appraisals increased to the needed loan amount, or "drive by" appraisals; (4) lack of required borrower equity or down payment; (5) insufficient borrower credit scores or repayment ability; (6) loans to finance land flips generating seller profits of over ten percent; and (7) multiple loans on foreclosed properties to avoid or delay loss recognition.

5.     FDIC-R asserts claims against two former executives Defendants Stephen J. Klein ("Klein"), Chief Executive Officer ("CEO"), and Irwin W. Berman ("Berman"), President, for negligence and gross negligence for failing to supervise the CDLD lending function and Levine, the Chief Redevelopment Lending Officer ("CRLO"), despite knowledge of prior misconduct by Levine, and other obvious "red flags" of problems in the CDLD.

6.     FDIC-R also asserts claims against Klein, Cohen and Constance E. Perrine ("Perrine") for negligence and gross negligence for approving, directing and/or permitting wasteful OREO expenditures after the OCC rated OMNI a composite CAMELS 5 on September 15, 2008.

7.     In addition, FDIC-R asserts a claim against Lawrence for his negligence and gross negligence in his wasteful OREO expenditures after September 15, 2008.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to 12 U.S.C. § 1811 et seq.; 12 U.S.C. §1819(b)(1), (2)(A); 28 U.S.C. §§1331 and 1345.  FDIC-R has the power to bring suit in any court of law.  12 U.S.C. § 1819.

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as all or substantially all of the events and/or omissions giving rise to the claims asserted herein occurred in this district.

## THE PARTIES

10.    FDIC-R is an instrumentality of the United States of America, established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1833(e), with its principal place of business in Washington, D.C.  12 U.S.C. § 1821(d).

11.    Defendant Klein was the CEO and Chairman of the Board of Directors ("Board") of the Bank from March 30, 2000, until his termination on March 26, 2009.  Klein is a citizen of the State of Georgia residing in Atlanta, Georgia.

12.    Defendant Berman was the Bank's President from October 28, 2005, until his demotion to Chief Risk Manager ("CRM") on April 14, 2008.  He also

was a director of the Bank from March 30, 2000, until September 10, 2008.  He

was terminated on September 10, 2008.  Berman is a citizen of the State of Georgia

residing in Roswell, Georgia.

13.     Defendant Cohen was an Assistant Vice President ("AVP") in the

CDLD from January 17, 2006, to October 31, 2007, when he was promoted to

Senior Vice President ("SVP") of the CDLD.   On December 20, 2007, Cohen

replaced Levine as head of the CDLD.  Cohen is a citizen of the State of Georgia

residing in Atlanta, Georgia.

14.     Defendant Greenblatt was a Vice President ("VP") in the CDLD from

June 7, 2004, until the Bank failed.  Greenblatt is a citizen of the State of Georgia

residing in Atlanta, Georgia.

15.     Defendant Lawrence was a lending officer in the CDLD beginning on

October 2, 2006.  On March 1, 2008, he was promoted to AVP of the CDLD, and,

on October 16, 2008, he was promoted to VP of Omni Community Development

Corporation ("CDC"), a Bank subsidiary which held some of the Bank's OREO

property.  He held this position until the Bank failed.  Lawrence currently resides

in Pennington Gap, Virginia.

16.     Defendant Lawson was Executive Vice President ("EVP") and Chief

Credit Officer ("CCO") of the Bank from April 14, 2003, until it failed.  Lawson is

a citizen of the State of Georgia residing in Atlanta, Georgia.

17.     Defendant Levine was EVP and Chief Redevelopment Lending Officer ("CRLO") of the CDLD and a director of the Bank from March 30, 2000, until his forced retirement on December 20, 2007.  Levine currently resides in Montgomery, AL.

18.     Defendant Livengood was a VP in the CDLD from September 19, 2005, until the Bank failed.  Livengood is a citizen of the State of Georgia residing in Atlanta, Georgia.

19.     Defendant Patten was a VP in the CDLD from January 17, 2006, until the Bank failed.  Patten is a citizen of the State of Michigan residing in Attica, Michigan.

20.     Defendant Perrine was Chief Financial Officer ("CFO") of the Bank from March 2006 until she was promoted to President of the Bank on April 28, 2008.  She was the Bank's President and a director of the Bank from April 28, 2008, until the Bank failed.  Perrine is a citizen of the State of Georgia residing in Roswell, Georgia.

## FACTUAL BACKGROUND

21.     On April 4, 1992, Klein and Levine formed Omni Funding Corporation ("OFC") as a private corporation to engage in redevelopment lending in low-income urban areas in the Atlanta area.  On September 26, 1996, OFC changed its name to Omni Financial Services, Inc. ("OFSI").

22.     On March 30, 2000, OFSI acquired United National Bank ("UNB") to provide funding for its redevelopment lending.  On February 15, 2001, UNB was renamed Omni and, on July 1, 2005, Omni moved its headquarters to Atlanta.

23.     From 2003 through 2008, Omni expanded its market area into seven states and its assets grew 462 percent, from $212 million to $980 million.  Omni relied heavily on brokered deposits and capital injections from OFSI to fund its growth.  The Bank's aggressive growth was concentrated in real estate lending.  CDLD loans were a primary catalyst for the Bank's rapid growth.  By 2007, Omni's real estate and CDLD loan portfolio was valued at $488 million and constituted 75 percent of its total loans.

24.     From 2000 to 2007, Levine, as CRLO, had largely unfettered and unsupervised control of Omni's CDLD lending function.   Under Levine's stewardship, the CDLD became the second largest loan generating unit for the Bank, and by 2007 it was generating 28 percent of the Bank's loans.

25.     The Omni Board of Directors and Klein delegated authority and responsibility to Levine and the CDLD to make short-term loans to purchase and redevelop housing in low-income areas.  The typical CDLD redevelopment loan had a 12-month term and was originated with three to six discount points and 12 to 18 percent interest.

26.   The Bank paid Levine as well as the other CDLD Defendants substantial bonuses based upon the short term income and profits generated by the CDLD's loan originations.   Levine and the other CDLD Defendants, driven by their desire to grow the CDLD loan portfolio to increase its income and profits and their own compensation, approved over two hundred redevelopment Loss Loans between April 15, 2005, and October 5, 2007, which violated the Bank's loan policies and procedures, banking regulations, and prudent and sound lending practices, causing over $24.5 million in losses to Omni.

27.   Defendants Klein and Berman failed to provide oversight of the CDLD lending function and to supervise Levine's management of the CDLD notwithstanding prior knowledge of his misconduct, violations of Bank policy and other obvious "red flags" of problems in the CDLD.   For example, in a letter dated January 10, 2002, copied to Berman, Klein reprimanded Levine for making a redevelopment loan to a severely delinquent borrower to cover a previous delinquency.   Klein cited Levine's "deliberate attempt to conceal the potential pecuniary loss" and enable his division to "overstate its income and new loans for the month, both of which would have an impact on [Levine's] year-end bonus."

28.   Moreover, from March 2005 through September 2007, Klein and Berman received quarterly asset quality summaries and past due reports showing an over eight-fold increase in non-performing loans and an almost five-fold

increase in criticized loans.  Because Klein and Berman both knew that residential real estate values were declining in 2006 and 2007, these increases should have produced similar proportional increases in OREO bookings and chargeoffs.  Yet, these same reports failed to show such proportional increases.  These obvious "red flags" were clear indications that Levine was mismanaging the CDLD by failing properly to book or value foreclosed properties, repeatedly financing sales of OREO, and failing to recognize losses in the redevelopment loan portfolio. Additionally, Klein knew that Levine had violated Bank policy by failing to place 90-day past due loans on non-accrual.  Klein and Berman, driven by their desire to aggressively grow the Bank's assets, income and profits, disregarded these obvious "red flags" and  failed to investigate or supervise Levine and the CDLD lending function.

29.    The 2007 decline in real estate values exposed Levine's mismanagement of the CDLD and Klein's and Berman's failure to supervise Levine and the CDLD lending function.  Unable or unwilling to repay their poorly underwritten loans, many CDLD borrowers defaulted.

30.    On October 10, 2007, Klein commenced a special investigation of Levine and the CDLD after learning that Levine and Greenblatt had diverted a $30,000 construction draw from a straw-borrower loan to pay a delinquent amount

owed by a developer on a different loan. Klein had reprimanded Levine for exactly this kind of reckless conduct in 2002.

31.    In December 2007, in the wake of widespread abuses in the CDLD and due to increasing defaults, delinquencies and foreclosures on CDLD loans resulting in substantial losses, Klein stopped CDLD lending and Levine was removed as CRLO on December 20, 2007.

32.    After the CDLD stopped lending in December 2007, Omni increased foreclosures and rapidly accumulated OREO properties. To avoid recognizing significant losses, Omni booked many of the OREO properties at inflated "as repaired" values rather than "as is" values, in violation of federal regulations and Bank policies. Additionally, instead of selling the OREO, Klein decided to renovate many of the OREO properties for lease to low income tenants.

33.    In or around January 2008, Klein placed Lawrence in charge of the OREO renovations. Lawrence reported to Cohen, who had replaced Levine as head of the CDLD on December 20, 2007. Cohen, in turn, reported to Perrine, who was promoted to President of the Bank on April 28, 2008. Klein, Perrine, and Cohen had oversight responsibility for the OREO including renovations and expenditures.

34.    On February 26, 2008, Klein presented his "Special Investigation" report to the Board in which he acknowledged widespread negligent and grossly negligent lending practices in the CDLD, including:

    a.  Use of straw borrowers to circumvent LTOB limits;

    b.  Loans in excess of LTV ratio limits;

    c.  Failure to obtain required appraisals, down payments, or creditworthy borrowers;

    d.  Excessive "land flip" profits by which sellers bought and sold the same property at inflated values, receiving over ten percent profit in violation of Bank policy; and

    e.  Multiple loans to finance sales of properties in increasing amounts to avoid OREO booking and loss recognition.

35.    On August 18, 2008, OCC examiners directed management to immediately write down the Bank's portfolio of unrepaired OREO properties by 32.5 percent to account for "entrepreneurial profit" buyer discounts.  This write drown caused a 33 percent reduction in the Bank's Tier 1 capital.  The examiners further directed management to re-file the Bank's 12/31/07, 3/31/08 and 6/30/08 Call Reports to properly report these severe write downs and reductions in capital.

36.    By September 15, 2008, the real estate market had collapsed, especially in the Atlanta area.  On that date, OCC delivered to the Bank its 2007 Report of Examination ("RoE"), in which it rated the Bank a composite CAMELS 5.  A "5" rating, which is the lowest possible, denotes the existence of extremely

unsafe and unsound conditions, the number and severity of which are beyond management's ability or willingness to correct. The OCC 2007 RoE warned management and the Board that the Bank's capital and liquidity were critically deficient and that it was "highly probable" that the Bank would fail.

37.   Nonetheless, instead of liquidating the additional OREO properties "as-is" to conserve its remaining capital, and to the detriment of the Bank, from September 15, 2008, through the Bank's failure on March 27, 2009, Lawrence, with the knowledge, direction, and/or approval of Cohen, Perrine and Klein, expended over $12.6 million (38 percent of the Bank's remaining Tier 1 capital as of September 30, 2008) to maintain, rehabilitate, renovate and/or improve additional OREO properties. Lawrence, Cohen, Perrine and Klein directed, approved and/or permitted these expenditures when they knew or should have known that these expenditures were speculative, unreasonable and the Bank had no reasonable prospect of recouping them. These expenditures further depleted Omni's already critically deficient capital which hastened the Bank's failure and increased its losses, ultimately paid by the Deposit Insurance Fund. In making these OREO expenditures, Lawrence, Cohen, Perrine and Klein also failed to ensure that the expenditures added value to the OREO property that the Bank was likely to recover. These negligent and grossly negligent acts amounted to the waste of Omni's assets.

## A.  The CDLD Loan Policy and the Loss Loans

38.    The CDLD had written policies and procedures specifically governing the underwriting and administration of redevelopment loans (the "CDLD Loan Policy."). The CDLD Loan Policy was intended to ensure that the Bank pursued prudent redevelopment lending practices and to limit the Bank's risk exposure by requiring compliance with, among other, the following provisions:

a.  All new customers must pay a minimum $5,000 down payment in cash or equivalent.

b.  Loans may not be made to borrowers with credit scores of less than 620.  Effective January 1, 2007, such loans were permitted only if the borrower made a down payment of ten percent or at least $10,000.

c.  A formal appraisal must be received by the Bank prior to loan closing.

d.  Potential land flips should be fully investigated.  For sales financed by the Bank, the seller may not receive more than a ten percent profit, the Bank should ensure that it is taking the title from the true owner, and the sales price should not be higher than the property's true appraised value.

e.  LTV ratio limits are 67 percent of the after-repaired ("ARV") of the property.  As of January 1, 2007, the LTV ratio limit was raised to 65-70 percent of ARV.

f.  The LTOB limit is $250,000.  Effective January 1, 2007, the LTOB limit was increased to $350,000.

g.  A memorandum outlining key information about the borrower and the property must be in the loan file.

h.  Construction draws should never be used to cover a loan payment.

i.  If more than one loan payment is returned for insufficient funds, the borrower must submit the next three payments by certified funds.

j.  Loans 90 days past due should automatically be placed on nonaccrual.

k.  Transactions involving false documentation, straw borrowers, misappropriation and diversion of funds, false appraisals, or similar improprieties are prohibited.

l.  A delinquent loan cannot be renewed.

m. Immediately after foreclosure, the responsible loan officer should order a new appraisal of the OREO and inform the CCO and Loan Operations of the foreclosure.  Unless foreclosed property is sold to another buyer on the courthouse steps, the loan officer must book the property into OREO.

n.  The Bank may rebook OREO as a new redevelopment loan only if the new borrower provides a ten percent cash or equivalent down payment.  In violation of 12 C.F.R. § 34.83, effective January 1, 2007, the CDLD Loan Policy deleted this restriction.

o.  OREO should be booked at the lower of "as is" market value or loan balance.

39.   A list of the Loss Loans is attached hereto and incorporated herein as Exhibit "A."[1]  These Loss Loans are illustrative, not exhaustive, of negligent and grossly negligent loans approved by the CDLD Defendants, and FDIC-R reserves its right to add additional Loss Loans.

40.   The CDLD Defendants repeatedly approved the Loss Loans without complying with the CDLD Loan Policy and without proper underwriting or credit

---

[1]   The borrowers referenced in Exhibit A are identified by initials and loan number.

administration.   Each Loss Loan suffered from several of the following obvious violations and deficiencies:

   a.   exceeding LTOB limits through use of straw borrowers;

   b.  exceeding  LTV ratio limits;

   c.  appraisal noncompliance such as loan disbursement prior to receipt of appraisal, stale appraisals, re-dated appraisals increased to the needed loan amount, or "drive by" appraisals;

   d.  lack of required borrower equity or down payment;

   e.  insufficient borrower credit scores or repayment ability;

   f.  loans to finance land flips generating seller profits of over ten percent; and

   g.  multiple loans in increasing amounts on foreclosed properties to avoid OREO bookings and to avoid or delay loss recognition.

   41.   The Loss Loans were also made in violation of the general safety and soundness standards of 12 C.F.R. §364.101, Appendix A, the general underwriting standards of 12 C.F.R. §364.101, Appendix A, and the real estate lending standards of 12 C.F.R. §365.2, Appendix A.

   42.   The CDLD loan to KG[2] provides an example of the repeated and obvious violations of CDLD loan policies, banking regulations, and prudent and sound lending practices.  On September 27, 2007, Defendants Levine, Cohen, and Greenblatt approved a $308,875 redevelopment loan to KG to finance her

_____

[2]   The borrower referenced herein is identified by initials.

acquisition of OREO property from Omni and redevelopment of the property. The loan was secured by the distressed inner-city residential property at 636 Lawton Street. The Bank previously had foreclosed on the same property twice after defaults on prior redevelopment loans. The KG loan violated the CDLD Loan Policy, banking regulations, and prudent and sound lending practices in the following respects:

a. The loan was funded before obtaining an appraisal on the property, and the "as-is" appraisal of $249,500 issued two weeks *after* closing was not an ARV appraisal as required by the CDLD Loan Policy.

b. The borrower reported total liquidity of $4,000 and a credit score lower than the score required. Due to a credit score below the minimum, KG was required to make a ten percent/$10,000 down payment.

c. The borrower had a history of outstanding federal tax liens and credit delinquencies and had no experience rehabilitating inner-city distressed property.

d. The Bank failed to require a ten percent down payment, in violation of 12 C.F.R. § 34.83.

e. The borrower was a straw borrower for the actual redeveloper and intended source of repayment. At the time, the redeveloper was delinquent on over $1 million in loans from Omni and had issued 35 bad (NSF) checks to the Bank over the preceding year. At Levine's direction, Greenblatt diverted $30,000 of the loan proceeds to cover one of the redeveloper's outstanding delinquencies.

KG defaulted on the loan less than two months after origination, resulting in a loss of $134,020 to Omni.

43.     The CDLD Defendants each approved the following number of Loss Loans and/or increases thereof, of the total CDLD loans listed in Exhibit A:  Cohen (13), Greenblatt (175), Lawrence (17), Lawson (27), Levine (198), Livengood (37), and Patten (30), which approvals of Loss Loans by each CDLD Defendant caused damages in at least the following amounts: Cohen ($1.9 million), Greenblatt ($20.8 million), Lawrence ($1.9 million), Lawson ($3.2 million), Levine ($23.3 million), Livengood ($4.1 million), and Patten ($3.6 million).

## CLAIMS FOR RELIEF

### COUNT I

**(Negligence Claim Against CDLD Defendants
for Approving Loss Loans)**

44.     FDIC-R incorporates by reference each of the allegations in paragraphs 1-31, 34, and 38-43 of this Complaint as though fully set forth herein.

45.     As lending officers, each of the CDLD Defendants owed the Bank the obligation to exercise the degree of diligence, care, and skill which ordinarily prudent persons in like positions would exercise under similar circumstances in the evaluation and approval of the Loss Loans including, but not limited to: (a) conducting proper due diligence on proposed loans and the risks such loans posed to the Bank before approving them; (b) complying with the Bank's loan policies; (c) ensuring that any loans they approved were underwritten in a safe and sound manner; (d) ensuring that any loans they approved were made to credit worthy

borrowers with the ability to repay, and were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the risk of loss to the Bank; (e) ensuring that any loans they approved did not violate applicable banking laws and regulations; and (f) ensuring that any loans they approved did not create unsafe and unsound concentrations of credit. The CDLD Defendants in fact possessed greater skill, knowledge, and intelligence in regards to banking practices and, as such, they should be held to the standard of an ordinarily prudent person possessing these superior attributes.

46.     By their actions and inactions, as described specifically and generally herein, each of the CDLD Defendants, as officers of the Bank, repeatedly failed and neglected to perform their respective duties with due care and diligence and took actions and made decisions without being reasonably informed and without regard to their risks, constituting breaches of their statutory and common law duties of care owed to the Bank by, among other things: (a) failing to conduct proper due diligence on the Loss Loans and the risks the Loss Loans posed to the Bank before approving them; (b) disregarding the Bank's loan policies and approving the Loss Loans on terms that violated the Bank's loan policies; (c) failing to ensure that the Loss Loans were underwritten in a safe and sound manner; (d) failing to ensure that the Loss Loans were made to creditworthy borrowers and secured by sufficiently valuable collateral and guarantees in order to

prevent or minimize the risk of loss to the Bank; (e) failing to ensure that the Loss Loans did not violate applicable banking laws and regulations; and (f) failing to ensure that the Loss Loans did not create unsafe and unsound concentrations of credit.

47.     As a direct and proximate result of the negligent acts and omissions of the CDLD Defendants, the Bank suffered damage and sustained losses exceeding $24.5 million, or such other amount as may be proved at trial.

48.     With respect to their actions and inactions in managing the affairs of the Bank, Defendants pursued a common plan or design and, therefore, each CDLD Defendant is jointly and severally liable for all losses on the Loss Loans each approved.

## COUNT II

### (Gross Negligence Claim Against CDLD Defendants For Approving Loss Loans)

49.     FDIC-R incorporates by reference each of the allegations in paragraphs 1-31, 34, and 38-48 of this Complaint as though fully set forth herein.

50.     Section 1821 (k) of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") holds directors and officers of financial institutions personally liable for loss or damage caused by their "gross negligence," as defined by applicable state law.

51.     In the alternative, the acts and omissions of the CDLD Defendants, described particularly in paragraphs 1-31, 34, and 38-48 of this Complaint, demonstrate the failure to exercise that degree of care that every person of common sense, however inattentive he may be, exercises under the same or similar circumstances, or lack of the diligence that even careless persons are accustomed to exercise.   Each of the CDLD Defendants in approving the Loss Loans repeatedly disregarded and violated the Bank's policies and procedures, banking regulations and prudent and sound lending practices as described herein, and acted without being reasonably informed and without regard to the risks of their actions, exhibiting such a degree of carelessness and/or inattention as to constitute an abuse of discretion and thus, gross negligence under Georgia law.

52.     As a direct and proximate result of the CDLD Defendants' grossly negligent acts and omissions as described herein, the Bank suffered damage and sustained losses exceeding $24.5 million, or such other amount as may be proved at trial.

53.     With respect to their grossly negligent actions and inactions, the CDLD Defendants pursued a common plan or design and therefore, each CDLD Defendant is jointly and severally liable for all losses on the Loss Loans each approved.

## COUNT III

**(Negligence and Gross Negligence Claims Against Defendants Klein Berman, Perrine and Cohen For Failure to Supervise)**

54.   FDIC-R incorporates by reference each of the allegations in paragraphs 1-53 of this Complaint as though fully set forth herein.

55.   Among other duties, as CEO, Klein was responsible for the overall management of the Bank, including but not limited to the CDLD, and owed the Bank the obligation to exercise the degree of diligence, care, and skill which ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight and conduct of the Bank's business. These duties included, but were not limited to:  ensuring that the Bank had adequate policies, procedures and internal controls relating to, among other things, CDLD lending and that the Bank adhered to its policies, procedures and controls and complied with banking regulations and prudent and sound lending and OREO investment practices and did not waste corporate assets.  He was also responsible for supervising various officers, including, but not limited to, Berman, Perrine, Levine, Cohen and Lawrence.

56.   Among other duties, as President of the Bank from October 28, 2005, through April 14, 2008, Berman reported to Klein and was responsible for daily operation of the Bank and owed the Bank the obligation to exercise the degree of diligence, care, and skill which ordinarily prudent persons in like positions would

exercise under similar circumstances in management, oversight and conduct of the Bank's business.  These duties included,  but were not limited to:  ensuring that the Bank had adequate loan policies, procedures and internal controls relating to, among other things, CDLD lending and that the Bank adhered to its policies, procedures and controls, complied with banking regulations and prudent and sound lending practices.  He also was responsible to supervise Levine as CRLO.

57.    Among other duties, as President of the Bank from April 28, 2008, until the Bank failed, Perrine was responsible for the daily operations of the Bank and owed the Bank the obligation to exercise the degree of diligence, care, and skill which ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight and conduct of the Bank's business.  These duties included, but were not limited to, ensuring that the Bank had a reasonable prospect of recouping its investment in OREO properties.  She also was responsible to supervise Cohen and Lawrence.

58.    Among other duties, as the SVP, Cohen was charged with oversight of OREO expenditures from March 6, 2008, until the Bank failed.  Cohen owed the Bank the obligation to exercise the degree of diligence, care, and skill which ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight and conduct of the Bank's investment in OREO.  These duties included, but were not limited to, ensuring that the Bank had

a reasonable prospect of recouping its investment in OREO properties.  He also was responsible to supervise Lawrence who had responsibility for OREO renovations.

59.    By their actions and inactions, as described specifically and generally herein, Defendants Klein, Berman, Perrine, and Cohen, as officers of the Bank, repeatedly failed and neglected to perform their respective duties with due care and diligence and took actions and made decisions without being reasonably informed and without regard to their risks, constituting breaches of their statutory and common law duties of care owed to the Bank, as follows:

a.  As to Klein, his negligent acts included, without limitation:

i.   pursuing an aggressive CDLD lending strategy that placed short term income and profits ahead of compliance with Bank policies, banking regulations and prudent and sound lending practices;

ii.  failing to ensure that the Bank's CDLD lending complied with the Bank's policies and procedures, banking regulations, and prudent and sound lending practices, and that the Bank had sound internal controls to assure compliance;

iii. failing to monitor and supervise Levine's management of the CDLD;

iv.  disregarding and failing to investigate after notice of obvious problems (i.e. "red flags") in the CDLD;

v.   failing to ensure that the Bank promptly booked OREO and accurately valued foreclosed properties, promptly and accurately classified delinquent and defaulted CDLD loans, established necessary loss reserves, and recognized losses;

vi. failing to ensure that investments in OREO after September 15, 2008, were safe, sound, and reasonable, and that the Bank had a reasonable prospect of recouping its investment;

vii. directing, authorizing, and/or permitting speculative, unsafe, unsound and wasteful OREO expenditures after September 15, 2008, in violation of prudent banking practices and federal regulations.

b. As to Berman, his negligent acts included, without limitation:

i. pursuing an aggressive CDLD lending strategy that placed short term income and profits ahead of compliance with Bank policies, banking regulations and prudent and sound lending practices;

ii. failing to ensure that the Bank's CDLD lending complied with the Bank's policies and procedures, banking regulations, and prudent and sound lending practices and that the Bank had sound internal controls to assure compliance;

iii. failing to monitor and supervise Levine's management of the CDLD;

iv. disregarding and failing to investigate after notice of obvious problems (i.e. "red flags") in the CDLD;

v. failing to ensure that the Bank promptly booked OREO and accurately valued foreclosed properties, promptly and accurately classified delinquent and defaulted CDLD loans, established necessary loss reserves, and recognized losses.

c. As to Perrine, her negligent acts included, without limitation:

i. failing to ensure that the Bank's OREO investments after September 15, 2008, were safe and sound and that the Bank had a reasonable prospect of recouping its investment;

     ii.  directing, authorizing, and/or permitting speculative, unsafe, unsound and wasteful OREO expenditures after September 15, 2008, in violation of prudent banking practices and federal regulations;

    iii.  failing to ensure that the Bank promptly booked OREO and accurately valued foreclosed properties, promptly and accurately classified delinquent and defaulted CDLD loans, established necessary loss reserves, and recognized losses.

  d.  As to Cohen, his negligent acts included, without limitation:

     i.  failing to ensure that investments in OREO after September 15, 2008, were safe, sound, and reasonable, and that the Bank had a reasonable prospect of recouping its investment;

    ii.  directing, authorizing, and/or permitting speculative, unsafe, unsound, and wasteful OREO expenditures after September 15, 2008, in violation of prudent banking practices and federal regulations.

60. In the alternative, the acts and omissions of Defendants Klein, Berman, Perrine and Cohen, described particularly in paragraphs 1-59 of this Complaint, demonstrate the failure to exercise that degree of care that every person of common sense, however inattentive he may be, exercises under the same or similar circumstances, or lack of the diligence that even careless persons are accustomed to exercise. As set forth in paragraphs 1-59 above, Defendants Klein, Berman, Perrine and Cohen repeatedly disregarded and violated the Bank's policies and procedures, banking regulations, and prudent and sound banking practices as described herein, and acted without being reasonably informed and without regard to the risks of their actions, exhibiting such a degree of carelessness

and/or inattention as to constitute an abuse of discretion and thus, gross negligence under Georgia law.

61.    As a direct and proximate result of Defendant Klein, Berman, Perrine and Cohen's negligent and grossly negligent actions and omissions as described herein, the Bank suffered damage and sustained the following losses:  Klein- $37.1 million; Berman- $24.5 million; Perrine- $12.6 million and Cohen- $12.6 million, or such other amounts as may be proved at trial.

## COUNT IV

**(Negligence and Gross Negligence Claims
Against Lawrence For Mismanagement of OREO)**

62.    FDIC-R incorporates by reference each of the allegations in paragraphs 1-20, 32-33, and 35-37 of this Complaint as if fully set forth herein.

63.    Among other duties, as VP, Lawrence was responsible for the management of OREO including, but not limited to, construction and related expenditures.  He was also responsible for adhering to Bank policy and banking regulations related to OREO and to make sure that all OREO expenditures were reasonable and that the Bank had a reasonable prospect of recouping its investment.

64.    By his actions and inactions, as described specifically and generally herein, Defendant Lawrence, as an officer of the Bank, repeatedly failed and neglected to perform his respective duties with due care and diligence and took

actions and made decisions without being reasonably informed and without regard

to their risks, constituting breaches of his statutory and common law duties of care

owed to the Bank, as follows:

> i. failing to ensure that the Bank's OREO investments after September 15, 2008, complied with banking regulations and prudent and sound OREO investment practices;

> ii. failing to ensure that investments in OREO after September 15, 2008, were reasonable and that the Bank had a reasonable prospect of recouping its investments;

> iii. directing speculative, unsafe, and unsound investments in OREO after September 15, 2008, in violation of banking regulations and prudent and sound OREO investment practices, and without a reasonable prospect of recouping the investments.

65.    In the alternative, the acts and omissions of Defendant Lawrence

described particularly in paragraphs 1-20, 32-33, 35-37, and 62-64 of this

Complaint demonstrate the failure to exercise that degree of care that every person

of common sense, however inattentive he may be, exercises under the same or

similar circumstances, or lack of the diligence that even careless persons are

accustomed to exercise.  As set forth in paragraphs 1-20, 32-33, 35-37, and 62-64

above, Defendant Lawrence repeatedly disregarded and violated the Bank's

policies and procedures, banking regulations and prudent and sound practices as

described herein, and acted without being reasonably informed and without regard

to the risks of his actions, exhibiting such a degree of carelessness and/or

inattention as to constitute an abuse of discretion and thus, gross negligence under Georgia law.

66.     As a direct and proximate result of Defendant Lawrence's negligent and grossly negligent actions and omissions as described herein, the Bank suffered damage and sustained losses in the amount of $12.6 million or such other amount as may be proved at trial.

## COUNT V

### (Corporate Waste Claim Against Defendants Klein, Perrine, Cohen and Lawrence)

67.     FDIC-R incorporates by reference each of the allegations in paragraphs 1-20, 32-33, 35-37, 54-55, and 57-66 of this Complaint as if fully set forth herein.

68.     As officers of Omni, Defendants Klein, Perrine, Cohen and Lawrence owed the Bank fiduciary duties to care for its property and assets.  Georgia statutory law provides that a director or officer of a corporation may be personally liable for "[t]he acquisition, transfer to others, loss, or waste of corporate assets due to any neglect of, failure to perform, or other violation of duties."  O.C.G.A. § 14-2-831.

69.     Defendants Klein, Perrine, Cohen, and Lawrence repeatedly neglected and failed to perform or otherwise breached their duties in the management and

preservation of Omni's assets and each of their following actions and inactions

violate O.C.G.A. § 14-2-831 and constitute waste of those assets:

    a. failing to prevent wasteful expenditures of $12.6 million on OREO properties after September 15, 2008, in the face of a collapsing real estate market, the Bank's critically deficient capital and liquidity, and the Bank's highly probable failure;

    b. directing, authorizing, approving and/or allowing such OREO expenditures after September 15, 2008, when they knew or should have known that there was little or no hope of recouping them;

    c. authorizing, approving and/or allowing such OREO expenditures after September 15, 2008, when they knew or should have known that these expenditures did not add value to the OREO properties that was reasonably calculated to reduce the shortfall between the properties' market value and the Bank's investment in them;

    d. violating regulations prohibiting speculative, unsafe, and unsound OREO expenditures made after September 15, 2008; and

    e. failing to dispose of OREO properties in "as-is" condition after September 15, 2008, to conserve capital which was critically deficient.

70.    The actions and inactions of Defendants Klein, Perrine, Cohen, and Lawrence described herein relating to OREO and expenditures were consciously taken without regard for the risks to the Bank and served no sound corporate purpose.  No reasonable business person would have authorized or allowed the expenditure of the Bank's funds in view of the dire financial condition of the Bank, the substantial certainty that these expenditures would not be recouped, and the

failure of the Bank to receive a fair benefit, constituting corporate waste and an abuse of discretion.

71.    With respect to their acts and omissions constituting the waste of Omni's assets, Defendants Klein, Perrine, Cohen and Lawrence pursued a common plan or design and, therefore, each is jointly and severally liable for all losses resulting therefrom.

## RELIEF REQUESTED

72.    Pursuant to Federal Rule of Civil Procedure 38, FDIC-R demands a trial by jury on all claims.

73.    On Counts I-V, FDIC-R prays for judgment against Defendants, jointly and severally as to their acts and omissions undertaken pursuant to a common plan or design, and jointly with respect to their other acts and omissions, in sums to be proven at trial, with interest pursuant to 12 U.S.C. § 1821(l), the costs of this action, and such other legal, general, and equitable relief to which FDIC-R is entitled.

CERTIFICATION PURSUANT TO LOCAL RULES

Pursuant to the Local Rules this certifies that this document was prepared using the New Times Roman font in 14 point.  These font and point selections are approved by L.R.5.1CB.

Respectfully submitted this 16th day of March, 2012.

SIMKINS HOLLIS LAW
GROUP, PC

/S. Paul Smith/
Jeanne Simkins Hollis
Georgia Bar No. 646890
S. Paul Smith
Georgia Bar No. 663577
1924 Lenox Road, NE
Atlanta, GA  30306
(404)474-2328 phone
(770)587-0726 FAX
psmith@shlglaw.com
*Attorneys for the Federal Deposit
Insurance Corporation, as Receiver of
Omni National Bank*

**OF COUNSEL:**

James A. Brown
E-mail:  jabrown@liskow.com
George Denegre, Jr.
E-mail:  gdenegre@liskow.com
Erin L. Delatte
E-mail:  eldelatte@liskow.com
LISKOW & LEWIS, PLC
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone:  (504) 581-7979
Facsimile:  (504) 556-4108